Joseph M. Alioto (SBN 42680)
Theresa D. Moore (SBN 99978)
Jamie L. Miller (SBN 271452)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Facsimile:  (415) 434-9200
Email:  jmalioto@aliotolaw.com
         jmiller@aliotolaw.com

[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CYNTHIA PROSTERMAN, JAN MARIE BROWN, CAROLYN FJORD, KATHERINE R. ARCELL, KEITH DEAN BRADT, JUDY BRAY, JOSÉ M. BRITO, ROBERT D. CONWAY, JUDY CRANDALL, ROSEMARY D'AUGUSTA, BRENDA K. DAVIS, PAMELA FAUST, DON FREELAND, DONNA FRY, GABRIEL GARAVANIAN, HARRY GARAVANIAN, YVONNE JOCELYN GARDNER, LEE M. GENTRY, VALARIE ANN JOLLY, GAIL S. KOSACH, JOHN LOVELL, MICHAEL C. MALANEY, LEN MARAZZO, LISA MCCARTHY, PATRICIA ANN MEEUWSEN, L. WEST OEHMIG, JR., DEBORAH M. PULFER, DANA L. ROBINSON, ROBERT A. ROSENTHAL, BILL RUBINSOHN, SONDRA K. RUSSELL, SYLVIA N. SPARKS, JUNE STANSBURY, CLYDE D. STENSRUD, WAYNE TALEFF, GARY TALEWSKY, ANNETTE M. TIPPETTS, DIANA LYNN ULTICAN, J. MICHAEL WALKER, PAMELA S. WARD, AND CHRISTINE WHALEN, <br><br> Plaintiffs, <br><br> v. <br><br> AIRLINE TARIFF PUBLISHING COMPANY, AMERICAN AIRLINES, INC., DELTA AIR LINES, INC. and UNITED AIRLINES, INC., <br><br> Defendants. | CASE NO.: <br><br> 3:16-cv-02017-MMC <br><br><br> **FIRST AMENDED COMPLAINT TO ENJOIN DEFENDANTS' VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT AND FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

- 1 -

The Plaintiffs bring this action under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and damages caused by reason of the Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

Plaintiffs purchase airline tickets from the defendant airlines for themselves and others. They complain and allege as follows:

## I. INTRODUCTION

Airline passenger service in the United States is critical for the economic, political, and social life of the citizens of the country. Competition and free market principles are essential to the Congressional plan to promote competition and prevent combination and monopoly. Since 2008, there has been a frenzied feeding of mega-mergers among and between the major airlines, so much so that the four major airlines now control 86% of the market. In addition, as admitted by the Chief Executive Officer of American Airlines, there is no likelihood of any new major airline entering the market. Consequently, the airline passenger market in the United States is a "closed" market, which substantially increases the likelihood of the four major airlines colluding to stabilize fares, routes, availability and innovation, and to eliminate any potential competition. To maintain and control the industry, the executives of the four major airlines communicate and network among and between themselves on a regular basis, including personal meetings at resorts and other locales.

One of the means used to control the industry is the establishment of a "clearinghouse" owned by the three major airlines, among others. This "clearinghouse," ATPCO, acts as a forum and platform to tie the major airlines together, thereby facilitating the ability of the airlines to stabilize fares, institute anticompetitive policies, and to impose restrictions on pricing.

Most recently, the Airline Defendants, in combination with ATPCO, instituted a

*First Amended Complaint to Enjoin Defendants' Violations of*
*Sections 1 of the Sherman Act and for Damages*

drastic change in the structure of pricing multi-city travel.  The purpose and effect of this new, drastic change was to prevent travelers from adding up the fares of individual trips, as had been the previous practice.  Instead, multi-city travelers would have to pay much higher fares, even if certain legs of their trip were priced at much lower amounts on segments in which the major airlines were competing against Ultra Low-Cost Carriers ("ULCCs").  In order to effectuate this new, drastic change and structure, agreement was necessary, because without unanimity of action, diversity of action would follow.  Compliance with these proposals involved a radical departure from the previous business practices of the industry and a drastic increase in fares for multi-city travelers.  Each major airline was aware that all were in active competition, and that, without substantially unanimous action with respect to the new restrictions for multi-city travel, there was risk of a substantial loss of business and goodwill.  However, with unanimity, there was the prospect of substantial increases in profits.  It was, therefore, strong motive for concerted action.

On or about April 1, 2016, the Airline Defendants formally announced their agreement to make the new rule change, using basically the same language by each.  The Airline Defendants then implemented their scheme and have continued to do so since.  The necessary consequence of the Airline Defendants' acceptance of the invitation to participate in this plan is a restraint in violation of Section 1 of the Sherman Act.

## II.   NATURE OF THE ACTION

1.      This action arises out of a combination and conspiracy by and among the three largest commercial passenger airlines in the United States, United Airlines, Inc., American Airlines, Inc. and Delta Air Lines, Inc. (collectively, the "Airline Defendants"), who together control over 51 percent of the market for domestic passenger air travel in the United States, and the Airline Tariff Publishing Company ("ATP") (all defendants are collectively referred to

as the "Defendants") to fix, raise, maintain and/or stabilize prices for air passenger transportation in the United States by, *inter alia*, colluding to change the structure of the rule for pricing domestic multi-city airfares on what are referred to in the airline industry as "circle trips," "open jaw trips" and "end-on-end trips," so that the Airline Defendants could – and did – raise prices to consumers for such trips by as much as 7 times.  The Defendants achieved this by colluding to change the structure of fares for domestic multi-city flights to no longer permit non-refundable fares for each leg of such flights to be combined to arrive at a single price for the entire multi-city itinerary, as had been the case before the rule change, thereby causing consumers to pay hundreds and even thousands of dollars more for exactly the same flights.

2.     Following the Airline Defendants' and ATP's agreement to change the rules for pricing domestic multi-city itineraries, airfare for such trips rose substantially despite dramatic declines in the cost of jet fuel, the Airline Defendants' single greatest cost of operations.

3.     The combination and conspiracy began sometime prior to mid-March 2016, and went into effect on or about March 15, 2016 (the time-frame was described by an American Airlines, Inc. representative as "mid-March").  It continues to the present.

4.     The intent, purpose and effect of the conspiracy was and is to fix, raise, maintain, and or stabilize prices for air passenger transportation services on multi-city trips within the United States in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by, among other actions, Defendants colluding to change the fare structure and thereby fix the prices of airfares on multi-city trips in the United States.

5.     The Plaintiffs are air travel passengers and travel agents who bring this action under Sections 4 and 16 of the Clayton Antitrust Act to prohibit the Defendants from fixing

and stabilizing prices for domestic multi-city airfares in violation of Section 1 of the Sherman

Antitrust Act and for treble damages.

## III.   JURISDICTION AND VENUE

6.      This complaint is filed under Sections 4 and 16 of the Clayton Antitrust Act, 15

U.S.C. §§ 15 and 26, to recover damages and obtain equitable relief, including costs of suit

and reasonable attorneys' fees, for violations of Section 1 of the Sherman Antitrust Act, 15

U.S.C. § 1.  The Court has original federal-question jurisdiction over the Sherman Act and

Clayton Act claims asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton

Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside,

transact business, are found and/or have agents within this District, and a substantial part of

the events giving rise to Plaintiffs' claims occurred in this District and a substantial portion of

the affected interstate trade and commerce described herein has been carried out in this

District.

8.      This Court has personal jurisdiction over Defendants because, *inter alia*, each:

(a) transacted business in this District; (b) directly sold and delivered passenger air

transportation in this District; (c) has substantial aggregate contacts within this District; or (d)

engaged in an illegal conspiracy that was directed at, and had the intended effect of, causing

injury to persons and entities residing in, located in, or doing business in this District.

## IV.   PLAINTIFFS

9.      Each Plaintiff named herein is an individual and a citizen of the state listed as

the address for each such Plaintiff, and in the four years next prior to the filing of this action,

Plaintiffs purchased airline tickets for themselves and as travel agents on behalf of others from

the Airline Defendants as a result of which they have suffered pecuniary and irreparable injury

to themselves, their property and their businesses, and each Plaintiff expects to continue to purchase airline tickets, and/or continue in the business of purchasing airline tickets, from the Airline Defendants in the future:

Cynthia Prosterman, 527 20th Avenue, San Francisco, CA  94121;

Jan Marie Brown, 975 Kennedy Dr., Carson City, NV, 89706;

Carolyn Fjord, 4405 Putah Creek Road, Winters, CA 95694;

Katherine R. Arcell, 4427 S. Miro St., New Orleans, LA 70125;

Keith Dean Bradt, 690 W 2nd St, Suite 200, Reno, NV  89503;

Judy Bray, 5140 N Union Blvd., Ste. 200, Colorado Springs, CO  80918;

José M. Brito, 2715 Sage Bluff Ct., Reno, NV  89523;

Robert D. Conway, 6160 W Brooks Ave., Las Vegas, NV 89108;

Judy Crandall, 4085 Ramrod Circle, Reno, NV  89519

Rosemary D'Augusta, 347 Madrone St., Millbrae, CA 94030;

Brenda K. Davis, 11022 Old Military Trail, Forney, TX, 75126;

Pamela Faust, 6227 Whileaway Dr., Loveland, OH  45140;

Don Freeland, 73801 White Sands Dr., Thousand Palms, CA 92276;

Donna Fry, 6740 Northrim Ln., Colorado Springs, CO  80919;

Gabriel Garavanian, 104 Sequoia Road, Tyngsboro, MA 01879;

Harry Garavanian, 104 Sequoia Road, Tyngsboro, MA 01879;

Yvonne Jocelyn Gardner, 10-Gold Coin Ct., Colorado Springs, CO 80919;

Lee M. Gentry, 7021 Forestview Dr., West Chester, OH 45069-3616;

Valarie Ann Jolly, 2121 Dogwood Loop, Mabank, TX 75156;

Gail S. Kosach, 4085 Ramrod Cir., Reno, NV 89519;

John Lovell, 1801 Breton Rd., Grand Rapids, MI 49546

*First Amended Complaint to Enjoin Defendants' Violations of*
*Sections 1 of the Sherman Act and for Damages*

Michael C. Malaney, 5395 Egypt Creek NE., Ada, MI 49301;

Len Marazzo, 1260 Springer Ct., Reno, NV 89511;

Lisa McCarthy, 35 Lancashire Place, Naples, FL 34104;

Patricia Ann Meeuwsen, 1062 Wedgewood, Plainwell, MI  49080;

L. West Oehmig, Jr., 1017 East Brow Road, Lookout Mountain, TN 37350;

Deborah M. Pulfer, 16264 E. Mason Rd., Sidney, OH  45365;

Dana L. Robinson, 127B Palm Bay Terrace, Palm Beach Gardens, FL  33418;

Robert A. Rosenthal, 4659 Bridle Pass Drive, Colorado Springs, CO  80923;

Bill Rubinsohn, 261 Old York Road, Jenkintown, PA 19046;

Sondra K. Russell, 1206 N. Loop 340, Waco, TX 76705;

Sylvia N. Sparks, 3320 Conte Drive, Carson City, NV  89701;

June Stansbury, 363 Smithridge Park, Reno, NV 89502;

Clyde D. Stensrud, 1529 10th St. W., Kirkland, WA 98033;

Wayne Taleff, 768 Farmsworth Ct., Cincinnati, OH 45255;

Gary Talewsky, 12 Cortland Dr. Ext., Sharon MA 02067

Annette M. Tippetts, 2783 East Canyon Crest Dr., Spanish Fork, UT 84660;

Diana Lynn Ultican, 9039 NE Juanita Dr, #102, Kirkland, WA  98034;

J. Michael Walker, 11865 Heather Ln., Grass Valley, CA 95949;

Pamela S. Ward, 1322 Creekwood Dr., Garland, TX 75044; and

Christine Whalen, 1129 Pine St., New Orleans, LA 70118

## V.   DEFENDANTS

10.     United Airlines, Inc. (individually, "United") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 233 South Wacker Drive, Chicago, Illinois, 60606, and is a named defendant herein. United

conducts air passenger transportation services throughout the United States, including within this District.

11.     American Airlines, Inc. (individually, "American") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 4333 Amon Carter Boulevard, Fort Worth, Texas, 76155, and is a named defendant herein. American conducts air passenger transportation services throughout the United States, including within this District.

12.     Delta Air Lines, Inc. (individually, "Delta") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1030 Delta Boulevard, Atlanta, Georgia, 30354, and is a named defendant herein. Delta conducts air passenger transportation services throughout the United States, including within this District.

13.     Airline Tariff Publishing Company (individually, "ATP") is, upon information and belief, a District of Columbia corporation with its principal place of business at Washington Dulles International Airport, 45005 Aviation Drive, Dulles, Virginia, and is a named defendant herein.

14.     ATP is a not-for-profit corporation which is wholly owned by a group of airlines that includes the Airline Defendants in this action.

15.      Whenever this Complaint refers to any act, deed, or transaction of any Defendant, it means the Defendant engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they actively were engaged in the management, direction, control, or transaction of its business or affairs.

## VI.    CO-CONSPIRATORS

16.    Various others, not named as Defendants, have participated as co-conspirators with the Defendants in the violations alleged in this Complaint, and have performed acts and made statements in furtherance thereof.

## VII.    TRADE AND COMMERCE

17.    During the period of time covered by this Complaint, each of the Airline Defendants has been engaged in the business of selling and providing air passenger transportation services throughout the United States.

18.    Each of the Airline Defendants provides scheduled domestic air passenger transportation services throughout the United States, including to and from numerous city pairs within the United States.  A city pair is a set of two cities between which scheduled air passenger transportation services are provided.  Each Airline Defendant competes with each of the other Airline Defendants for travelers throughout the United States.

19.    In 2015, approximately 696 million passengers traveled within the U.S. on domestic airlines, generating record revenues of approximately $146.75 billion, and their revenues for the first quarter in 2016 exceeded revenues for the first quarter in 2015 ($34.6 billion versus $34.4 billion).  Total net income for all domestic air carriers in 2015 was approximately $26.4 billion, also a record.

20.    American's domestic air passenger transportation services revenues were approximately $20.7 billion in 2015, a record.  American's domestic net income for 2015 was approximately $5.57 billion, a record, up from approximately $971 million in 2014.

21.    Delta's domestic air passenger transportation services revenues were approximately $27.8 billion in 2015, a record.  Delta's domestic net income for 2015 was approximately $3.12 billion, a record, up from approximately $562.4 million in 2014.

22.     United's domestic air passenger transportation services revenues were approximately $22 billion in 2015, close to 2014's record $22.3 billion.  United's domestic net income for 2015 was approximately $3.9 billion, a record, up from approximately $369 million in 2014.

23.     During the complaint time period, a substantial portion of each Airline Defendant's revenues has been derived from the sale and provision of air passenger transportation services between different states.  The activities of each of the Airline Defendants have been within the flow of, and have substantially affected, interstate trade and commerce.

24.     ATP is owned by the Airline Defendants and 12 other airlines.  The only other United States carriers with an ownership interest in ATP are the much smaller Alaska Airlines and Hawaiian Airlines.  Thus, the U.S. passenger airlines that own ATP are the behemoths, American, Delta and United, which together control more than 51 percent of the U.S. market, plus the two smaller U.S. airlines.

25.     At all times relevant hereto, ATP has been engaged in the collection, processing  and dissemination of air passenger transportation fare data on behalf of the Airline Defendants and the publishing of airfare rules, including the so-called Category 10 airfare rules for the combinability of airfares for multi-city flight itineraries (the "CAT 10 rules") that are set by the Airline Defendants.  As described below, the Airline Defendants transmit fare information, including fare rules and restrictions, to ATP which, in turn, disseminates the information to the airline industry.  The activities of ATP that are the subject of this Complaint have been within the flow of and have substantially affected interstate trade and commerce.

26.     Part of ATP's stated mission is to protect or increase airline revenue.  Together with, and at the direction of, the Airline Defendants, ATP sets the CAT 10 rules for pricing airfares for multi-city destination flights.

27.     ATP allows the Airline Defendants to easily and flexibly create, modify, match, cancel, fix and stabilize airfares among and between the Airline Defendants and it colludes with the Airline Defendants to change and publish airfare rules such as the CAT 10 rules.

28.      Each of the Airline Defendants is an owner of ATP and ATP maintains on their behalf a data base consisting of 32 categories of airfare rules, such as the CAT 10 rules, and other  airline fare information.  The fare rules contain the conditions and restrictions under which an airfare can be used or sold (*i.e.*, "fare restrictions").

## A.  THE STRUCTURE OF THE AIRLINE INDUSTRY IS CONDUCIVE TO COORDINATED BEHAVIOR

29.     The structure of the domestic passenger airline industry in the United States is conducive to collusion.  This is the result of several factors, including high industry concentration, high barriers to entry, the ownership and use of ATP by the Airline Defendants (which are the major domestic owners of ATP and control more than 51 percent of the U.S. domestic air passenger market).  This ability and propensity to collude has been demonstrated by numerous governmental and private legal actions brought against the Defendants.

30.     The domestic airline passenger industry is a tight oligopoly.  Due to a series of mergers beginning particularly in 2008, the three Airline Defendants, American, Delta and United, now control more than 51 percent of the market for domestic air passenger travel in the United States.  When Southwest Airlines – a non-owner of, but participant in, ATP – is taken into account, the Airline Defendants and Southwest control approximately 80 percent of the market.

31.     The U.S. airline industry went from ten major domestic air passenger carriers to four within a decade.  Average market concentration in airline hubs from 2004-2014, as measured by the Herfindahl-Hirschman Index ("HHI"), was between 3,400 and 3,750.[1]

32.     In its complaint challenging the merger between American and U.S. Airways in *United States v. U.S. Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.), which was filed on August 13, 2013, the Department of Justice (the "DOJ") noted that "[t]he structure of the industry is already conducive to coordinated behavior" and "[i]ncreasing consolidation among large airlines has hurt passengers[,]" including by "cop[ying] each other in raising fares, imposing new fees on travelers, reducing or eliminating service on a number of city pairs, and downgrading amenities.  An August 2012 presentation from US Airways observes that consolidation has resulted in 'Fewer and Larger Competitors.'"

33.     The three Airline Defendants have acquired the majority of the U.S. domestic passenger market.  They generally have the ability to enter each other's markets in order to take advantage of excessive price hikes by the others, lower their own prices and thereby capture market share.

34.     It is not difficult for the three Airline Defendants to agree on price structures and detect cheating because they admittedly "watch each other like hawks" and know about changes being proposed and made by each because they monitor ATP's rules queue to assess changes competitors are making.

35.     The Airline Defendants own ATP, an association whose stated mission is to protect or increase airline revenue by distributing fare and fare-related data allowing the

---

[1] HHI is a measure of market concentration used by federal regulators and is calculated by squaring the market share of the firms competing in a given market.  An HHI in excess of 2,500 means that the market in question is highly concentrated. https://www.justice.gov/atr/herfindahl-hirschman-index.

Airline Defendants to match, cancel, fix and stabilize airfares, a practice that facilitates price fixing that would be difficult for authorities to detect.

36.     The Airline Defendants submit airfare changes to ATP at least once each weekday.  After ATP receives the fare changes from the Airline Defendants, it processes the changes and disseminates information on daily fare changes to the Airline Defendants, including computer reservation systems owned by them.  The information disseminated by ATP is comprised of many different types of information and includes the rules involved in each Airline Defendant's pricing actions.

37.     Because of the substantial ownership of ATP by the Airline Defendants, American, United and Delta directly participate in making and changing ATP's rules pertaining to the setting of airfares for multi-city destination flights in the United States.

38.     The Airline Defendants receive reports from or through ATP which are transparent in the sense that they allow the Airline Defendants to monitor and analyze immediately each other's fare rules, restrictions and price changes.

39.     ATP's stated main purpose is to "offer[] a complete information resource for airlines, GDSs [Global Distribution Systems], and travel-related companies" so that its "products and systems deliver uniformity, protect airline revenues, create incremental revenues, and lower airline operating costs."

40.     ATP is the creation of airlines and in the United States it exists primarily for the benefit of the Airline Defendants.  The public is generally unaware of its existence or of the full extent of the Airline Defendants' responsibility for its existence.

41.     According to American, ATP operates as "an industry clearinghouse" and, according to Doug Sharpe, ATP's Manager of Customer Marketing and Sales, "Carriers, Systems and ATP[] work together towards establishing industry standards for processing

automated data." ATP's own "Business Model" depicts how ATP operates as a "hitching post" for the establishment of fares and the structure of fare rules (also described by ATP as "fare restrictions") by which the Airline Defendants are able to – and do – collude to set the structure of fare rules, including CAT 10 rules. ATP's Business Model is annexed hereto and incorporated herein as Exhibit A.

42.     ATP's CAT 10 rules contain restrictions on the combinability of fares on multi-city air travel itineraries. According to ATP's Doug Sharpe, the *"[r]estrictions are created and managed by the industry as a whole*, for the benefit of all carriers and pricing systems." (Emphasis added.) A copy of Doug Sharpe's statement is attached and incorporated herein as Exhibit F.

43.     The Airline Defendants are routinely informed of proposed or impending changes to ATP's rules structure by monitoring such changes in ATP's "rules queue." According to Timothy Lyon, the Managing Director for Revenue Management at American, "American knew about similar changes made by rival airlines because it monitors the ATP[] 'rules queue' to assess any changes that competitors *are making* in the marketplace." (Emphasis added.)

44.     Exchanging information by monitoring ATP's rules queue is a mechanism employed by the Airline Defendants to achieve what American's Timothy Lyon has described as "many fare rules that are as or more similar as these [CAT 10 rules], just as they often have similar (if not identical) fares on particular routes."

45.     Through ATP, the Airline Defendants have complete, accurate, and real-time access to every detail of every other airline's published fare structure on every route. U.S. Airways' management (prior to its merger with American) called ATP "a dedicated price-

telegraph network for the industry." (http://beta.kluwercompetitionlaw.com/Document/Details/kli-kcl-ecomp-201356430#opendocument).

46.     The Airline Defendants submit their pricing data to ATP, which then processes and sends the data to each of its members. The pricing data include fare rules (or restrictions), a fare base code (the name of the fare), the dollar amount, a first ticket date information (which indicates the first date a fare would be available for sale), and a last ticket date (which indicates the last date a fare would be available for sale). Using the first ticket date and the last ticket date, the Airline Defendants can change when fares become available for sale or when fares are no longer available for sale. The Airline Defendants submit these changes to ATP at least once each weekday.

47.     The public does not have access to ATP. ATP's rule changes are not publicly available and only GDSs and other ATP subscribers may access them.

48.     As presently operated, ATP continues to facilitate "coordinated interaction" by the Airline Defendants. American, Delta, and United are still owners of ATP. ATP maintains a service called FareManager, which it describes as follows:

> Our online FareManager system allows our customers the ease and flexibility to create, modify, match, or cancel airfares in seconds. In addition to fare information, ATP[] processes related data such as Rule, Routing, Footnote, Reservation Booking Designator (RBD), Ticketing Fees, Carrier-Imposed (YQ/YR) Fees, Optional Services, and Branded Fares. ATP[] also built and supports complex products such as Negotiated Fares and Fare By Rule, which create private and dynamic fares.

49.     ATP's FareManager program is intended to work in conjunction with its Market View program. ATP describes the latter as allowing airlines to monitor and analyze the fares of rivals and react accordingly:

> You can do that with Market View, an analysis tool that provides a comprehensive view of the market, including your own public

and private and your competitors' public fares and rules data,
Fare
By Rule, and dynamically constructed fares in a multi-carrier
display. With Market View, you can review market data then
directly navigate to FareManager to change your airline's fares,
rules, and footnotes, all within the same environment. Market
View is an easy-to-use tool that gives you the information you
need to get the right price in the right market at the right time.

50.     Thus, ATP affords its owners in the U.S. domestic market, and particularly the
Airline Defendants, the means and ability to coordinate their passenger airfare rules, airfares,
detect any cheating by a co-conspirator and take action to punish such cheating on a real-time
basis.

51.     The conclusion that the structure in the domestic airlines industry is conducive
to collusion is borne out by the fact that airlines have been accused by both regulators and
private parties on numerous occasions of engaging in anticompetitive activities and have
admitted liability or entered into significant settlements to avoid ongoing litigation.

52.     In 1992, the United States filed a lawsuit to stop several airlines from using
their ATP filings as a device to facilitate agreements on fares. *United States v. Airline Tariff
Pub. Co.*, 836 F. Supp. 9 (D.D.C. 1993). That lawsuit resulted in the filing of a consent decree
and a Competitive Impact Statement by the DOJ in which the government explained that it
had accused the defendants in that case, including American, United, Delta, and U.S. Airways
(which has since merged with American), of engaging in "various combinations and
conspiracies" with each other that consisted of agreements, understandings, and concerted
actions to fix prices by increasing fares, eliminating discount fares, and setting fare restrictions
for tickets purchased for travel between cities in the United States." The DOJ asserted that the
airlines used ATP to "(1) exchange proposals and negotiate fare changes; (2) trade fare
changes in certain markets in exchange for fare changes in other markets; and (3) exchange
mutual assurances concerning the level, scope, and timing of fare changes."

53.     The Competitive Impact Statement further asserted that the airlines had been charged with using ATP to "unnecessarily facilitate [] coordinated interaction among the airline defendants and co-conspirators, enabling them to: (1) communicate more effectively with each other to increase fares, *change fare restrictions*, and eliminate discounts; (2) show links between *proposed* fare changes in different city-pair markets; (3) monitor each other's *proposals* on fare changes; and (4) lessen uncertainty concerning each other's pricing *intentions*." (Emphases added).

54.     The consent decree in the ATP litigation lasted for ten years until 2004.  As late as 2004, the DOJ imposed a $3 million civil penalty against American for violating the decree.

55.     With respect to private class action litigation involving antitrust claims against the Airline Defendants, in *In re Domestic Air Transportation Antitrust Litig.*, 137 F.R.D. 677 (N.D. Ga. 1991) a nationwide class was certified with respect to allegations that the defendants fixed airfares throughout the United States.  The case was eventually settled for $408 million.  *In re Domestic Air Transportation Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1992).  In another case, Northwest Airlines (since merged with Delta), Delta, and U.S. Airways (since merged with American) were accused of colluding.  Summary judgment was denied and a class was certified. *In re Northwest Airlines Corp.*, 208 F.R.D. 174 (D. Minn.), *aff'd sub nom. In re Delta Air Lines, Inc.*, 310 F.3d 953 (8th Cir. 2002), *cert. denied sub nom. Northwest Airlines Corp. v. Chase*, 539 U.S. 904 (2003).

56.     The structuring and modifying of ATP's CAT 10 fare rules requires complex and time-consuming analysis to determine the effects such changes will have across the entire network of each of the huge domestic networks of the Airline Defendants because there are so

many combinations of fares and itineraries that can be created.  The Airline Defendants being the only remaining U.S. carriers with airport hubs around the country.

57.     The setting of airfares is extremely complex and involves an enormous transfer and manipulation of data.  According to ATP's Director of Customer Service, Joanna C. Bryant, "The various ways fares and their associated rules can be combined can quickly become highly complex."

58.     Because there are so many potential combinations of multi-city itineraries and combinations of fares, according to Ms. Bryant, "ATP[] considers Cat-10 to be one of the most complicated categories" of its 32 rule categories.

59.     The simultaneous change to an industry-wide fare structure with the far-reaching and economically significant effects of CAT 10's rules on the combinability of airfares in the complex, dynamic environment that exists in the domestic U.S. airline industry could only have occurred through concerted action by the Defendants

60.     ATP's fare dissemination system unnecessarily facilitates coordinated interaction among the Defendants and co-conspirators by enabling the Airline Defendants to: a) dialogue with one another about planned or contemplated changes to fare rules, increases to fares, and the elimination of discounts; b) monitor each other's intentions in regard to the foregoing; and c) lessen uncertainty about the other's pricing intentions.

## VIII.   FIRST CAUSE OF ACTION
### (Price Fixing)

61.     Plaintiffs reallege each of the foregoing paragraphs as if the same were set forth herein at length.

62.     Sometime before mid-March 2016, the Airline Defendants and ATP conspired to change ATP's CAT 10 rules on airfare combinability in order to prevent air travelers from being able to combine the least expensive, non-refundable, one-way fares for multi-city

destination flights which had theretofore enabled them to achieve a single, relatively inexpensive price for multi-city air travel, and to require instead that the passengers pay hundreds and even thousands of dollars more for the same multi-city flights than had been charged before the CAT 10 rule was changed.

63.     The Defendants changed the CAT 10 rules on combinability of airfares simultaneously in mid-March 2016, and the Airline Defendants publicly announced them for the first time contemporaneously on March 30 and April 1, 2016, in virtually the same terms.

64.     On April 1, 2016, American announced: "Recently American Airlines, along with other U.S. carriers, made changes to CAT 10 domestic combinability fare rules that impact certain one-way fares.  These changes prevent combining non-refundable local fares to create a connecting itinerary."  American's announcement is attached and incorporated as Exhibit B.

65.     On March 30, 2016, United announced: "Multiple U.S. carriers recently made changes to the CAT 10 domestic combinability fare rules impacting some one-way fares."  A copy of United's announcement is attached and incorporated as Exhibit C.

66.     United's announcement contains a graphic example of how airfares for multi-city trips will be increased by reason of the illegal actions complained of herein.  The example is for multi-city trips from Los Angeles to Houston to New York and from Los Angeles to Houston to New Orleans.  The fares for each individual leg of the trip is in black, while United's newly imposed illegal "path fares" are depicted in blue.  See Exhibit C.

67.     On or about April 1, 2016, Delta stated: "Delta Air Lines recently made a change to the combinability of one-way fare products."  And, "End-on-end combinability of non-refundable fares has been restricted."  Delta's announcement is attached and incorporated as Exhibit D.

68.     The above announcements of the new airfare rules by the Airline Defendants were made contemporaneously, whereas fares and rule changes of such magnitude in the airline industry are usually first implemented by one airline, observed for some time by other airlines to determine their effectiveness, and then followed later by the other airlines.

69.     In this instance, in addition to announcing that the Airline Defendants had changed the CAT 10 combinability rules, they simultaneously implemented and put them into effect by simultaneously increasing prices for multi-city flight itineraries by up to 7 times.

70.     The Airline Defendants all increased their multi-city fares despite the fact that their greatest cost component – jet fuel – had steeply fallen in price and was at record low levels and each of the Airline Defendants was reaping record high profits.

71.     Significantly increasing prices in the face of steeply falling costs was anomalous behavior by the Airline Defendants because the falling costs had increased each airline's profit margin at its existing prices and, absent collusion, would have caused at least one of them to reduce its prices slightly in order to take business from its competitors, and not increase its prices.

72.     The change in ATP's CAT 10 rule structure was so rapid that it could not have been accomplished without agreement by the Airline Defendants on the details of the new structure, the timing of its adoption, and the price increases that would follow its adoption.

73.     The Defendants' changes to the CAT 10 fare structure served to "deliver uniformity" and "protect airline revenues," consistent with ATP's stated purpose.  Delivering uniformity by changing the CAT 10 fare structure is tantamount to "fixing or stabilizing" prices for domestic air travel on multi-city itineraries.

74.     The Airline Defendants' reason for changing the CAT 10 fare structure was to charge lower prices on flight legs where they compete against low cost and ultra-low cost

*First Amended Complaint to Enjoin Defendants' Violations of*
*Sections 1 of the Sherman Act and for Damages*

carriers and then make up the deficit by charging fares up to 7 times higher to customers for the very same flight because they happen to be flying additional legs on a multi-city itinerary. American's spokesman Joshua Freed said: "The change was made in mid-March to stop flyers from paying fares lower than the airline had intended for certain markets."

75.     Simultaneously the Airline Defendants changed their CAT 10 pricing structure for multi-city airfares, which are complex, to a uniform pricing structure, and then all immediately jacked up their prices.

76.     Although the three Airline Defendants generally have the ability to enter each other's markets in order to take advantage of excessive price hikes by the others, lower their own prices and thereby capture market share, they have not done so in this instance.  Instead, they have all raised prices to supra-competitive levels at the same time on their existing multi-city routes.

77.     The Airline Defendants are not required to adhere to the new CAT 10 fare structure.  Doing so, against their individual economic interests, strongly supports a conclusion of express collusion.

78.     The combination and conspiracy consist of agreements, understandings, and concerted actions by the Airline Defendants and ATP to change the structure of ATP's rules for multi-city airfares in the United States in order to eliminate discounted fares, significantly increase fares, and set restrictions on tickets purchased for multi-city air travel within the United States.

79.     For the purpose of forming and effectuating the combination and conspiracy, the Airline Defendants and co-conspirators, together with and through ATP, did the following things, among others:

(a)     agreed to higher fares for multi-city air travel by changing the CAT-10 rules to eliminate the "combinability" of lower, non-refundable, one-way fares on multi-city

itineraries and require that airfares be fixed for the multi-city itinerary at prices costing Plaintiffs and other consumers up to 7 times the cost of the formerly combinable, non-refundable, one-way fares for the same itinerary;

(b)     agreed to prohibit passengers and travel agents, including Plaintiffs, from purchasing separate, less-expensive legs of air travel for multi-city flight itineraries;

(c)     agreed to threaten travel agents, including Plaintiffs, who fail to charge the new, higher, fixed airfares for multi-city travel with "debit memos" requiring the travel agents to pay the Airline Defendants the difference between the lower per-leg prices at which they formerly booked flights and the now non-combinable higher, fixed prices;

(d)     agreed, and threatened, that passengers who continue to purchase fares for separate legs of a multi-city air itinerary, rather than a more expensive ticket under the newly restricted CAT-10 rules for the same multi-city travel will suffer the loss of baggage;

(e)     agreed, and threatened, to charge passengers $200.00 in change fees for each leg of a multi-city itinerary where each leg is booked separately rather than as a single, more expensive ticket under the new, restricted CAT-10 rules;

(f)     agreed, and threatened, to refuse to deal with travel agents, including Plaintiffs, who do not charge the Airline Defendants' higher, fixed prices under the new CAT-10 rules, but instead book multi-city itineraries for their customers by combining the less expensive, non-refundable, airfares for each leg of the itinerary, as they did before the Defendants' illegal agreement.

80.     The Defendants each took the actions they agreed to take.

81.     The domestic air passenger industry used to be marked by numerous major competitors, price wars and the addition of passenger capacity.  The domestic airline passenger industry is now highly concentrated with the three Airline Defendants controlling better than 51 percent of available passenger seats and with high barriers to entry into the industry.

82.     Airfares are also transparent to the Airline Defendants who jointly own ATP, enabling them to monitor each other's fares, adjust their fares in real time, and change ATP's rules under which fares for multi-city air travel are determined.  The Defendants also facilitated this conspiracy by, *inter alia*, limiting the ability of consumers to compare airfares.

83.     It is estimated that the change in the CAT 10 rules by the Airline Defendants will affect between and 20 and 25 percent of  business multi-city trips in the United States by significantly increasing the cost of the same.

84.     On April 7, 2016, the Associated Press reported on a comparison of prices for multi-city fares under the Airline Defendants' former, traditional method of pricing, and the fares in effect under their new Cat 10 agreement:

(a)     A Delta itinerary flying from Orlando to Detroit to New York and back to Orlando, traditionally priced by combining the fare for each leg of the trip, had a price to the customer of $282.00.  When priced according to the Airline Defendants' new agreement, the same trip now costs $2,174.00 (an overcharge of $1,892.00).

(b)     An American itinerary flying from Miami to Chicago to San Francisco and back to Miami, traditionally priced by combining the fare for each leg of the trip had a price to the customer of $664.00.  When priced according to the Airline Defendants' new agreement, the same trip now costs $1,064.00 (an overcharge of $400.00).

(c)     A United itinerary flying from New York to Ft. Lauderdale to Chicago and back to New York, traditionally priced by combining the fare for each leg of the trip had a price to the customer of $308.00.  When priced according to the Airline Defendants' new agreement, the same trip now costs $507.00 (an overcharge of $199.00).

85.     The "Cranky Flier" blog, which is devoted to air travel issues, reported on March 31, 2016, that under the Defendants' agreement, a passenger flying an American itinerary in May 2016, from San Francisco to Washington DC, then from Washington DC to Dallas and then back to San Francisco will pay a round-trip fare of $1,837.20, rather than $412.80 if the segments were purchased individually for the very same flights, at the very same time, on the very same aircraft, in the very same seat (i.e., $206.60, $88.10 and $118.10, respectively); an overcharge of $1,424.40.

86.     Similarly, a check of the Airline Defendants' fares for mid-week travel in May 2016, disclosed the following exorbitant price increases for multi-city itineraries:

(a)     A United itinerary flying May 10-13, from New Orleans to Denver to Chicago and back to New Orleans, priced by combining the one-way fare for each leg of the

trip would have a cost to the customer of $312.30. When priced according to the Airline Defendants' new agreement, the lowest fare for the same trip will cost $457.70.

(b)      A Delta itinerary flying May 10-13, from New Orleans to Atlanta to New York and back to New Orleans, priced by combining the one-way fare for each leg of the trip would have a cost to the customer of $321.30. When priced according to the Airline Defendants' new agreement, the lowest fare for the same trip will cost $520.70.

(c)      An American itinerary flying May 10-13, from New Orleans to Dallas to Minneapolis and back to New Orleans, priced by combining the one-way fare for each leg of the trip would have a cost to the customer of $263.80. When priced according to the Airline Defendants' new agreement, the lowest fare for the same trip will cost $517.20.

87.      On April 8, 2016, U.S. Senator Bob Menendez called for an investigation of the Defendants for the acts alleged herein, citing several examples graphically depicting the enormous fare increases which airline passengers are required to pay as a result of the illegal actions by the Defendants. Copies of the graphs contained in the press release exemplifying the dramatic increases in fares as a result of the Defendants' acts are attached and incorporated as Exhibit E.

88.      This combination and conspiracy has, and continues to have, the following effects, among others:

(a)      price competition among the Airline Defendants for the provision of air passenger transportation services in domestic multi-city destination flights has been unreasonably restrained;

(b)      Plaintiffs and their customers have been deprived of the benefits of free and open competition in the sale of domestic air passenger transportation services and have paid supra-competitive prices for multi-destination flight itineraries as a result of the Defendants' combination and conspiracy changing ATP's CAT 10 combinability rules and thereby fixing and stabilizing fares on domestic multi-city air travel;

(c)      Plaintiffs, in their capacities as travel agents, have suffered, and are continuing to suffer, damages the extent of which are currently unknown and will be extraordinarily difficult to ascertain, as well as irreparable harm by reason of the Defendants' agreement to change ATP's CAT 10 combinability rules and fix and stabilize fares on domestic multi-city air travel in the following ways:

(i)      Plaintiffs are now required to expend an inordinate amount of time booking individual one-way legs of multi-city flights in order to save their

- 24 -

customers hundreds, and in some cases thousands, of dollars they would otherwise be required to pay as a result of the Defendants' conspiracy. In many cases the time required to book the identical multi-city trip has increased from approximately five minutes to twenty minutes or more by reason of the need to enter full data sets for each passenger on each one-way leg and obtain a Personal Name Report ("PNR") for each leg. This is a time-consuming process for which Plaintiffs cannot be compensated;

(ii)   By booking multi-city flights for their customers by combining non-refundable one-way fares at a lower aggregate cost than the illegal fares newly imposed by the Airline Defendants, the Plaintiffs are threatened by the Airline Defendants with the imposition of substantial "debit memos" in the future;

(iii)   By booking multi-city flights for their customers by combining non-refundable one-way fares at a lower aggregate cost than the illegal fares newly imposed by the Airline Defendants, the Plaintiffs are threatened with being cut off from booking flights with the Airline Defendants with the consequential damage to or loss of Plaintiffs' travel agency businesses. United currently states in its ticketing guidelines for travel agents:

> "Authorization to sell United tickets and services is contingent upon compliance with United's  policies and guidelines for bookings, inventory availability, ticketing, refunds, exchanges, tariffs and commission.  Violations or failure to meet these guidelines may result in loss of an agency's appointment, which will prohibit participation in the sale of United transportation and services, including booking active and passive
> segments or claiming United segments in any computer reservation
>
> system."

(iv)   By booking multi-city flights for their customers by combining lower cost non-refundable, one-way flights contrary to the Defendants' new CAT 10 rule, the Plaintiffs' customers risk losing baggage or incurring additional baggage charges, or incurring flight cancellation or change fees of up to $200.00 per person, per leg,  if the leg of a flight itinerary is delayed or canceled.

89.   The Airline Defendants have the ability and are likely to penalize Plaintiffs as they have threatened to do by terminating their ability to book flights and purchase tickets as travel agents and by imposing substantial financial penalties on them if the Plaintiffs do not abide by the CAT 10 rules set by the Defendants.

90.     As a result of the foregoing, Plaintiffs' have been damaged in an amount which is not yet ascertained.

91.     In addition, as a result of the above, Plaintiffs' relationships with their customers have been and will continue to be injured and they will suffer injury to their reputations and businesses, which will either not be compensable by money damages, or they will be extraordinarily difficult to ascertain.

## IX.   SECOND CAUSE OF ACTION
### (Coordination Facilitating Device)

92.     Plaintiffs reallege each of the foregoing paragraphs as if the same were set forth herein at length.

93.     During the period beginning sometime prior to mid-March 2016, and continuing to the present, each of the Defendants and co-conspirators engaged in various combinations and conspiracies in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The offenses will continue unless the relief hereinafter prayed for is granted.

94.     The combinations and conspiracies consist of an agreement, understanding, and concert of action among the Defendants and co-conspirators to create, maintain, operate, and participate in the setting of, rules for multi-city domestic air passenger transportation services which are published and disseminated by ATP as a system that has been formulated and is operated in a manner that unnecessarily facilitates coordinated interaction among the Airline Defendants and co-conspirators by enabling them to, among other things:

(a)     engage in a dialogue with one another about planned or contemplated increases to fares, changes in fare structures and the elimination of discounts;

(b)     monitor each other's intentions concerning increases to fares, changes in fare structures, withdrawals of discounted fares; and

(c)     lessen uncertainty concerning each other's pricing intentions.

95.     The combination and conspiracy has had and continues to have the following additional effects:

(a)     coordinated interaction among the Airline Defendants and co-conspirators has been made more frequent, more successful, and more complete;

(b)     price competition among the Airline Defendants for the provision of air passenger transportation services for domestic multi-city flight itineraries has been unreasonably restrained; and

(c)     Plaintiffs and other consumers of air passenger transportation services have been deprived of the benefits of free and open competition in the sale of such services, including by having to pay supra-competitive prices for multi-city flights.

## X.  PRAYER

WHEREFORE, Plaintiffs pray:

A.     That the Court adjudge and decree that the Defendants and co-conspirators engaged in unlawful combinations and conspiracies in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

B.     That the agreement among the Defendants be declared null and void and unenforceable.

C.     That each Defendant, its officers, directors, agents, employees, and successors and all other persons acting or claiming to act on its behalf be temporarily, preliminarily, and permanently enjoined and restrained from:

(i)     enforcing any practice or policy that requires Plaintiffs to book flights to multi-city destinations at fares which are greater than the sum of the combined non-refundable one-way fares for each leg of a passenger's flight;

(ii)     agreeing with any other airline to fix, establish, raise, stabilize, or maintain any fare, fare restriction or fare structure;

(iii)     disseminating to the other Airline Defendants certain information concerning any planned, contemplated or proposed fare, fare restriction or any planned or contemplated change to fares or fare structures;

and

*First Amended Complaint to Enjoin Defendants' Violations of*
*Sections 1 of the Sherman Act and for Damages*

(iv)   penalizing Plaintiffs for booking multi-city flight itineraries in the manner proscribed by (i) above, including, without limitation, by issuing debit memos or limiting or terminating Plaintiffs' authorization to book flights on the Airline Defendants.

D.   That Plaintiffs be awarded treble their damages, attorneys' fees, interest and costs of suit.

E.   That Plaintiffs have such other and further relief as the nature of the case may require and the Court may deem just and proper.

## XI.   JURY DEMAND

Plaintiffs hereby demand a trial by jury of all matters properly triable thereto.

Dated:  August 12, 2016                     ALIOTO LAW FIRM

                            By:     *s/ Joseph M. Alioto*
                                    Joseph M. Alioto (SBN 42680)
                                    Theresa D. Moore (SBN 99978)
                                    Thomas Paul Pier (SBN 235740)
                                    Jamie L. Miller (SBN 271452)
                                    ALIOTO LAW FIRM
                                    One Sansome Street, 35th Floor
                                    San Francisco, CA  94104
                                    Telephone:  (415) 434-8900
                                    Facsimile:   (415) 434-9200
                                    E-mail:  jmalioto@aliotolaw.com
                                             tmoore@aliotolaw.com
                                             tpier@aliotolaw.com
                                             jmiller@aliotolaw.com

*First Amended Complaint to Enjoin Defendants' Violations of*
*Sections 1 of the Sherman Act and for Damages*

## PLAINTIFFS' COUNSEL

Joseph M. Alioto (SBN 42680)
Theresa D. Moore (SBN 99978)
Jamie L. Miller (SBN 271452)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Facsimile:   (415) 434-9200
Email:  jmalioto@aliotolaw.com
            jmiller@aliotolaw.com

Gil D. Messina
*Pro Hac Vice Pending*
MESSINA LAW FIRM
961 Holmdel Road
Holmdel, NJ  07733
Telephone:  (732) 332-9300
Facsimile:  (732) 332-9301
Email: gmessina@messinalawfirm.com

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
The Cornerstone Building
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Facsimile: (707) 963-0706
Email: lgpapale@papalelaw.com

*First Amended Complaint to Enjoin Defendants' Violations of*
*Sections 1 of the Sherman Act and for Damages*

EXHIBIT A



ATPCO Business Model

EXHIBIT B

American Airlines

An update to domestic fare combinability rules



## Good Morning,

Recently American Airlines, along with other U.S. carriers, made changes to CAT10 domestic combinability fare rules that impact certain one-way fares. These changes prevent combining nonrefundable local fares to create a connecting itinerary.

### What did we change and why?

We restricted end-on-end combinations of non-refundable fares. These discounted local fares were sometimes pieced together to generate a connecting itinerary priced below the intended fare for that origin and destination. We've always intended to price our fares based on the passenger's origin and the final intended destination. We changed fare and ticketing policies to ensure various fares are used in this way on multiple-segment itineraries.

### Does this affect multi-city trips as well?

Yes, while we planned to limit changes to "sum of locals" pricing, we unintentionally impacted the pricing structure for some multi-city trips, "circle trips" and open jaw itineraries. We've adjusted filings to reduce these unintentional changes and will continue to work on technical enhancements in order to address these complex itineraries.

### What if travelers want to continue booking multiple tickets?

We strongly discourage purchasing separate tickets to make a connection. Traveling on separate tickets increases the likelihood of travel impacts such as missed connections for checked baggage or cancelled tickets if travelers miss a connection.

Please review aa.com/agency for more details about our policies related to these bookings.

For more information, please feel free to reach out to me. And as always, thank you for your business.

Sincerely,

Esther Maldonado

Managing Director, Southwestern Division Sales
American Airlines

  

View Privacy Policy

This email has been sent on behalf of American Airlines. We are happy to help you with any questions or concerns you may have. For all inquiries about American Airlines or the AAdvantage® program, visit aa.com/contactaa or contact us in writing at American Airlines, 4255 Amon Carter Blvd., MD 2400, Fort Worth, TX 76155-2503.

A portion of all travel booked on American Airlines may be American Eagle® service, operated by Compass Airlines, LLC, Envoy Air Inc., ExpressJet Airlines, Inc., Republic Airline Inc., SkyWest Airlines, Inc., Air Wisconsin Airlines Corporation, Mesa Airlines, Inc., PSA Airlines, Inc., Piedmont Airlines, Inc., or Trans States Airlines, LLC.

American Airlines, American Eagle, AAdvantage, AAdvantage Million Miler, Great for **Business** and the Flight Symbol logo are marks of American Airlines, Inc.

**one**world is a registered trademark of **one**world Alliance, LLC.

© 2016 American Airlines, Inc. All Rights Reserved.

This email and any information or files transmitted with it are solely for the confidential use of the recipient. This message contains confidential and proprietary information of American Airlines (such as American employee, customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient. If you have received this email in error please notify the sender and promptly delete this message and its attachments.

Please do not respond to this e-mail. This mailbox is for outgoing communications only. If you no longer wish to receive these messages or have additional questions, please contact your sales representative.

EXHIBIT C



# United Sales

**United News**

March 30, 2016

## Understanding domestic fare combinability rules

Multiple U.S. carriers recently made changes to the CAT10 domestic combinability fare rules impacting some one-way fares.

- **Non-refundable one-way fares** will only allow customers to travel either on a one-way itinerary or a round-trip  (to return back to the origin city e.g., A -> B -> A type combination).

- Combinability restrictions prevent "**sum of sector" pricing** of multi-city itineraries.

- Most legitimate open jaw and circle trips will now auto-price on a single ticket. Certain itineraries that previously priced using a single ticket will now require two or more tickets.
- As this change is in the fare rules, it **applies across all channels**, including united.com and GDS providers. Please note that although the GDS supports pricing of these itinerary types, current online booking tool (OBT) functionality may not support all itinerary type pricing requests.

Note that **refundable fares** may still be booked as end-on-end and are not impacted by these combinability restrictions. Many **international fare** rules already carry combinability

restrictions.

**What is sum of sector pricing?**

Sum of sector pricing is when multiple fare types are combined in order to price a fare lower than the available path (O&D) fare. Under the new combinability rules, this ticketing behavior is more restricted. An example of sum of sector pricing is below in black, while the path fares are in blue.



**How do the new combinability rules work?**

- EWR-LAX returning on SFO-EWR would be allowed on a single ticket (returns back to origin city).

- EWR-LAX, LAX-SFO returning SFO-EWR would be allowed on a single ticket (returns back to origin city).

- EWR-ORD returning ORD-LGA would be allowed on a single ticket (returns back to origin city, even though it is a different airport). ORD-LGA returning EWR-ORD would work as a single ticket as well.

- EWR-LAX, LAX-DEN returning DEN-LGA would be allowed on a single ticket (returns back to origin city, even though it is a different airport).

- EWR-LAX then LAX-EWR followed by EWR-IAH would not be allowed (origin and end point are different cities - this is seen as two trips). Another example of this would be flying EWR-LAX, then LAX-SFO, and ending with SFO-IAD.

**Can PNRs be built with multiple tickets?**

Although the United system does support multiple tickets in the same record, please visit united.com/agency for an overview of possible consequences of doing so.

EXHIBIT D



## Update on Fare Combinability Rules

(April 1, 2016) - Delta Air Lines recently made a change to the combinability category in the rules of certain one-way fare products. Based on feedback, we want to provide the following clarification:

**Here's what's the same:**
There are no changes to combinability rules on refundable fares.

**Here's what's changed:**
End-on-end combinability of non-refundable fares has been restricted.

**Can I still construct circle trips using one way fares?**
We did not intend to prevent the booking of legitimate circle trips using any available one way fares. You can book multiple one way tickets for the purpose of constructing legitimate circle trips and put them in one PNR.

**Can I book multiple tickets to construct connecting itineraries other than the ones that Delta publishes for sale?**
You can book any one way ticket we offer for sale, but we do not recommend using multiple one-way tickets to create connecting itineraries.  It increases the likelihood that customers could experience service failures such as lost baggage and missed connections.

# # #

EXHIBIT E







Three Booking Scenarios:





## FAIR FARES?

### Family of Four: Pick-Which-Grandparents Scenario

**Multiple Destinations - Together**
4 people, 3 stops
Newark to Dallas, Dallas to San Francisco,
San Francisco to Newark

Total Cost:
**$4,140**

**Multiple Destinations - Individual**
4 people, 3 stops
Newark to Dallas, Dallas to San Francisco,
San Francisco to Newark

Total Cost:
**$3,001**

**Visit Dallas or San Francisco? Or Both?**

Price Difference:
**$1,139**




## FAIR FARES?

### Special Occasions: Which-event-to-attend scenario

**Multiple Destinations - Together**
1 Adult, 3 stops
Newark to Dallas, Dallas to Tampa, Tampa to Newark

Total Cost:
**$567**

**Multiple Destinations - Individual**
1 Adult, 3 stops
Newark to Dallas, Dallas to Tampa, Tampa to Newark

Total Cost:
**$268**




**Bachelorette party and the wedding? Or just one?**

Price Difference:
**$299**

###

EXHIBIT F

TRAVELCONNECT

# Restriction Data

- Conditions of Carriage (Paper General Rules)
- Automated General Rules
- Fare Rules (Categories and Assumptions)
- Footnotes (Categories and Assumptions)
- Restrictions are created and managed by the industry as a whole, for the benefit of all carriers and pricing systems

arc